IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



**FILED**

FEB - 8 2016

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| UNITED STATES OF AMERICA, | Cause No. CR 12-66-BLG-SPW-02 |
| Plaintiff/Respondent, | CV 15-121-BLG-SPW |
| vs. | |
| LLOYD JOHN ROMERO, | OPINION and ORDER |
| Defendant/Movant. | |

This case comes before the Court on Defendant/Movant Romero's motion to

vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255. Romero is

a federal prisoner proceeding pro se.

## I. Preliminary Screening

The motion is subject to preliminary review to determine whether "the

motion and the files and records of the case conclusively show that the prisoner is

entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing

Section 2255 Proceedings for the United States District Courts.

A petitioner "who is able to state facts showing a real possibility of

constitutional error should survive Rule 4 review." *Calderon v. United States Dist.*

*Court*, 98 F.3d 1102, 1109 (9th Cir. 1996) ("*Nicolas*") (Schroeder, C.J.,

concurring) (referring to Rules Governing § 2254 Cases). "[I]t is the duty of the

court to screen out frivolous applications and eliminate the burden that would be

1

placed on the respondent by ordering an unnecessary answer." Advisory

Committee Note (1976), Rule 4, Rules Governing § 2254 Cases, *cited in* Advisory

Committee Note (1976), Rule 4, Rules Governing § 2255 Proceedings.

## II. Background

On August 3, 2010, MT Sports in Billings, Montana, reported that 113

handguns, 20 long rifles, and three shotguns had been stolen from one of its semi-

trailers parked at Conway Trucking. Over the next several months, 21 firearms

were recovered in Los Angeles and farther south, including three in Mexico.

In November 2010, Amanda Reichenberg, Benjamin McChesney's sister-in-

law, told investigators that she believed McChesney had stolen the guns and sold

them in California. Her statement was compelling because there had been no

reports in the press about the recovery of some guns in southern California and

Mexico.

In December 2010, Lindsey Schmaing Smith was shot in the head by Crystal

Lundberg. Although her injury was extremely serious, Smith survived and gave

several statements to law enforcement officers investigating the shooting. Among

her several statements, Smith gave one statement to ATF Agent Anuszczyk in

January 2011. She told the agent that Lloyd John "L.J." Romero and his friend

Ben McChesney had committed the Conway theft. She also said that she

accompanied Romero and McChesney to the Los Angeles area, where they sold

2

the firearms.

By following up on Smith's story, agents located Michelle Barton, McChesney's sister, in the Salt Lake area. When Barton was served with a grand jury subpoena, in about mid-May 2011, she called McChesney to tell him about it.

In the late spring of 2011, McChesney told Reichenberg that he had stolen the guns from Conway Trucking and he intended to go to Mexico with his wife, Reichenberg's sister, because he was afraid law enforcement was investigating him. McChesney also went to the home of a woman he was seeing, Bethany Carlin. "Hysterical," "[s]cared," "[c]rying," and "[s]ad," he confessed to her that he had committed the Conway Trucking theft and intended to flee to Mexico. McChesney did, in fact, go to Mexico.

On June 21, 2012, a grand jury indicted McChesney and Romero for conspiracy to use firearms during and in relation to a drug trafficking crime, a violation of 18 U.S.C. § 924(c)(1)(A) and (o) (Count 1); theft of firearms from a federally licensed dealer, a violation of 18 U.S.C. § 924(m) (Count 2); theft of firearms that had travelled in interstate commerce, a violation of 18 U.S.C. § 924(l) (Count 3); and possession of stolen firearms, a violation of 18 U.S.C. § 922(j) (Count 4). Romero was also charged with being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1) (Count 5). Assistant Federal Defender David Merchant was appointed to represent Romero. Order (Doc. 18).

McChesney chose to represent himself. Among other things, he moved for an order allowing him to consult with Romero at the jail about the defense. His motion was denied. *See* Order (Doc. 48). McChesney also filed a motion for severance on the grounds that Merchant refused to consult with him about the defense and McChesney expected Romero would seek to discharge Merchant, necessitating a continuance, while McChesney wanted to proceed to trial as scheduled. *See* Mot. to Sever (Doc. 52) at 2-4. That motion, too, was denied. Order (Doc. 58).

On June 17, 2013, Merchant moved to withdraw from representation due to a total breakdown in communications between him and Romero. Mot. to Withdraw (Doc. 67). After an ex parte hearing on June 27, 2013, the motion to withdraw was denied because Romero and Merchant, despite their differences, were able to communicate with each other. Order (Doc. 77).

Trial commenced on July 8, 2013. Before voir dire began, the United States dismissed Count 1, alleging conspiracy to use firearms in drug trafficking. Minutes (Doc. 104); 1 Trial Tr. (Doc. 186) at 19:10-20. The parties stipulated to submit Count 5 for the judge's decision at bench trial, based on evidence presented at trial and supplemented outside the jury's hearing. 1 Trial Tr. at 13:21-15:13.

Lindsey Schmaing Smith was the principal witness against Romero. Smith testified that she met Romero through her husband and formed a friendship with

him that became intimate. Smith said that, on August 3, 2010, Romero called her "in the middle of the night." He told her that he "might now have enough money" to take her and her children to San Luis Obispo, California, away from her abusive husband. Smith packed her and her children's things. About two hours later, Romero arrived at Smith's house. Romero was listening to a police scanner. McChesney arrived later. Around 11:00 a.m., Romero's sister Tana arrived with a rented Suburban. Romero loaded Smith's and her children's things into the Suburban, and he, Smith, and her children followed McChesney, who drove a little red pick-up truck. With Romero appearing happy to be leaving and "[k]ind of proud," but also "in a hurry to get out of town," they left Billings. On the way to Salt Lake, Romero showed Smith a handgun that appeared to be new because it was in a plastic package. 3 Trial Tr. (Doc. 188) at 202:9-211:18. Apparently indicating to the gun, Romero said, "This is what will happen if we get pulled over." *Id.* at 297:5-10.

Smith further testified that the group stayed overnight at the home of McChesney's sister, Michelle Barton. While they were there, Smith said, McChesney and Romero both told her to stay in the house while they met with some people in the back yard for about an hour. Smith also said she had a conversation with Barton that left her "upset," "scared," and "[c]onfused." *Id.* at 211:19-215:2. On cross-examination by McChesney, Smith was asked whether

5

she looked in the Suburban to see whether there were firearms inside. Smith asked

McChesney whether he was sure he wanted to ask her that question. He persisted.

She said, "Yes, I did look, Ben." She saw "[f]irearms. Just like your sister said."

*Id.* at 226:9-227:5.[1]

Smith also testified that, after their stay in Salt Lake, she and Romero had a

conversation about the stolen firearms. She described what Romero said and what

she felt at the time:

> We had talked about what was in the vehicle. He had told me it was
> enough to set us a future. He mentioned – he mentioned the single
> gun that he had showed me and said that there were many more that
> were going to give us a future.
>
> . . .
>
> I've got a lot of stolen guns behind my children. We're driving.
> And I don't know what's going to happen. He's using me as a cover-
> up and my children as a cover-up if we get pulled over. I may very
> well lose my kids, lose my life.

3 Trial Tr. at 216:6-9, 15-18. On cross-examination, Smith explained that she lifted

a blanket covering a large plastic tote or bin in the back of the Suburban and saw

boxes of guns inside it. *Id.* at 285:21-289:15.

After three days of testimony, the jury acquitted Romero on Counts 2 and 3,

the two theft counts, and convicted him on Count 4, possession of stolen firearms.

Based on the evidence presented at the jury trial and Romero's previous

---

[1] McChesney called his sister as a witness. She denied having told Smith there were firearms in the Suburban. *See* 4 Trial Tr. at 519:24-521:6, 560:7-14.

6

convictions, the trial judge found Romero guilty on Count 5. Jury Verdict (Doc. 128); Bench Verdict (Doc. 133). The jury convicted McChesney on Counts 2, 3, and 4, all three of the charges against him. Jury Verdict (McChesney) (Doc. 127).

A presentence report was prepared. Romero's advisory guideline range was 168-210 months. The statutory maximum on each count of conviction, however, was ten years. Romero was sentenced to serve ten years in prison on each count, concurrently, to be followed by a three-year term of supervised release. Minutes (Doc. 160); Judgment (Doc. 165) at 2-3.

Romero appealed. On December 2, 2014, the Court of Appeals affirmed his convictions and sentence. Mem. at 3, *United States v. Romero*, No. 13-30317 (9th Cur. Dec. 2, 2014) (Doc. 205). Romero did not file a petition for writ of *certiorari*, so his conviction became final on March 2, 2015. *Gonzalez v. Thaler*, __ U.S. __, 132 S. Ct. 641, 653-54 (2012); *Griffith v. Kentucky*, 479 U.S. 314, 321 & n.6 (1987).

Romero timely filed his § 2255 motion on November 23, 2015. 28 U.S.C. § 2255(f)(1).

### III. Claims and Analysis

Most of Romero's claims allege that counsel provided ineffective assistance. *Strickland v. Washington*, 466 U.S. 668 (1984), governs such claims. At this stage of the proceedings, Romero must allege facts sufficient to support an inference that

counsel's performance fell below an objective standard of reasonableness. *Id.* at 687-88. He must also allege facts sufficient to support an inference that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim . . . even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

### A. Severance

Romero contends that Merchant should have moved to sever his trial from McChesney's because McChesney's self-representation made it likely he would make mistakes that would prejudice Romero. Romero contends both that he wanted Merchant to coordinate his defense with McChesney's and that McChesney's "strategy . . . to point to some type of government conspiracy against him" and lack of competence meant that Romero "could not overcome his own co-defendant helping to convict him." Mot. § 2255 (Doc. 229) at 3-4.

The claim lacks merit. "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993); *see also* Fed. R. Crim. P. 14(a). Mutually exclusive defenses – for instance, where one defendant claims nothing happened and the other claims

the first defendant compelled him to participate in the alleged crime – might warrant severance. The Court is not aware of any precedent holding that it is advisable to sever defendants' trials merely because one defendant is self-represented and another is not.

To the extent Romero claims he wanted Merchant to cooperate with McChesney's defense, he certainly can make no claim for severance. To the extent Romero claims McChesney's ineptitude prejudiced him, he is simply mistaken. Smith's description of what she saw in the back of the Suburban came after she had testified on direct examination that she talked with Romero about the many stolen guns he planned to sell to set them up for the future. And the jury was instructed that it had to consider each count separately as to each defendant. Jury Instr. No. 4 (Doc. 121 at 6). Where evidence was admissible only against one defendant, the jury was also so instructed. *See, e.g.*, Jury Instr. No. 18 (Doc. 121 at 20). "The fact that the jury rendered selective verdicts is highly indicative of its ability to compartmentalize the evidence." *United States v. Stinson*, 647 F.3d 1196, 1205 (9th Cir. 2011) (internal brackets and quotation marks omitted) (quoting cases).

McChesney and Romero did not present mutually exclusive defenses, and the jury obviously decided the case against each defendant separately. The facts Romero alleges suggest neither deficient performance nor prejudice. This claim is

denied.

## **B. Failure to Call Expert Witness**

Romero claims counsel should have called an expert witness to establish that new firearms are not delivered to distributors encased in "packaging plastic" but only in a "hard plastic foam lined case." Mot. § 2255 at 5-6. The claim is based on the following testimony:

Prosecutor: At some point during the drive, did you see anything in L.J.'s hands or in his possession that caused you concern?

Smith: Yes, I did.

Prosecutor: What was it?

Smith: A small gun.

Prosecutor: Where was that?

Smith: Under the driver's side seat of the Suburban.

Prosecutor: Tell us about how you saw that, please.

Smith: He had pulled it out to show me. It was in plastic.

Prosecutor: In plastic?

Smith: Yes.

Prosecutor: What did it look like?

Smith: Just still plastic. Like, packaging plastic. Not a Ziplock, just clear plastic.

Prosecutor: Still in packaging plastic?

10

Smith: That's what it looked like to me, just plastic.

Prosecutor: Did it look like a new gun to you?

Smith: Yeah.

. . .

Smith: My dad owns a lot of guns. It looked new. I mean, it looked brand new. It was in a plastic package.

3 Trial Tr. at 210:8-25, 211:7-8. On cross-examination, Smith agreed three times that the "packaging plastic" was a "plastic bag." *Id.* at 263:2-3, 264:4-265:11.

Romero now contends that counsel was ineffective because he did not call an expert or rebuttal witness to testify that new firearms do not come in "packaging plastic" but in a "hard plastic foam lined case." It is not clear exactly what Smith meant by "packaging plastic" – although she seems to have meant a bag rather than the type of molded plastic packaging that is extremely difficult to open – but the reality underlying her description is not recoverable. The question is whether counsel was ineffective in failing to counter her testimony.

First, the allegation does not support an inference that Merchant's performance was unreasonable. He established that Smith did not tell the case agent that Romero showed her a gun in the car on the way to Salt Lake. *See* 3 Trial Tr. at 472:15-473:19; *see also* 4 Trial Tr. at 657:21-658:6. Therefore, Merchant had no way of anticipating that it would be useful to have a witness

11

ready to testify about how new firearms are packaged. Moreover, even if a rebuttal witness had been called, there is no particular reason to believe the gun was in the same packaging from the moment the thieves pried open the doors of the semi-trailer to the moment Romero showed it to Smith. It was not unreasonable for counsel to fail to obtain an expert in the midst of trial for the sake of presenting testimony of only questionable relevance.

Second, the allegation also does not support an inference that there is a reasonable probability Romero would have been acquitted if a witness had testified that new firearms do not come in "packaging plastic." Merchant, through the case agent, showed not only that Smith did not tell the case agent Romero showed her a gun in the car, but also that she did not tell the case agent she saw a large plastic tote full of guns in the back of the Suburban, or that there were several people, not just three, involved in the back-yard discussion in Salt Lake, or that she counted McChesney's money at the motel in California, or that McChesney was frightened and told everyone to "Get down, get down," when he saw a red car pull into the motel parking lot in California. *Id.* at 470:18-476:25. The matter of the "packaging plastic" was at best peripheral compared to Smith's new claims to have witnessed matters of central importance to the elements of the crimes charged. The jury was not persuaded by Smith's omissions of these important matters, so it was unlikely to be persuaded by evidence that she might have inaccurately

described the plastic.

Neither prong of the *Strickland* test is met. This claim is denied.

## C. Case Agent's Grand Jury Testimony

Romero points to an excerpt of Agent Anuszczyk's testimony before the grand jury. The agent testified that Smith said "they did have the guns with them going down to California. She did mention it was in Ben's car, 'cause it was Lloyd, her, and her kids in the other vehicle as they drove down to Southern Cal." Anuszczyk Grand Jury (Doc. 229-3) at 13:3-7. Romero appears to construe the agent's testimony to mean that Smith said, "All the firearms were in McChesney's vehicle on the entire trip from Billings to Los Angeles." He suggests that this statement conflicted with the prosecution's trial theory that the firearms were in the Suburban.

Romero's interpretation is unlikely. The agent was not asked how all the firearms moved from Billings to Los Angeles. The point was to establish that Smith said "they used these firearms as currency, essentially, to purchase narcotics," Anuszczyk Grand Jury at 13:8-10; McChesney took firearms away and returned with "$10,000 in cash and about 10 pounds of marijuana," *id.* at 13:1. This conduct violated 18 U.S.C. § 924(c)(1)(A) and (o) and related to Count 1 of the eventual Indictment. *See* Indictment (Doc. 1) at 2-4.

At any rate, pointing out the statement would have had little utility. Counsel

13

could have laid appropriate foundation to use the agent's grand jury testimony to impeach the agent's trial testimony, but that would have contradicted the reasonable and effective strategy of using the agent's competence to question Smith's credibility. *See* 3 Trial Tr. at 470:9-476:24. Counsel could also have asked Smith whether she ever told the agent that all the guns were in McChesney's car. Smith might have said yes and explained the statement away. Or she might have said no, in which case counsel would have had to ask the agent the same question, and the jury would have to decide whether the agent was wrong and Smith was right or vice versa. *See generally* Fed. R. Evid. 613. By contrast, what counsel actually did made the significant differences between Smith's pretrial statement and her trial testimony clear and easy for the jury to follow.[2]

The facts Romero alleges do not support an inference that counsel's failure to use the agent's testimony was unreasonable. There is no reasonable probability that Romero would have been acquitted if counsel had used the remark reported by the agent as Romero suggests. Neither prong of the *Strickland* test is met. This claim is denied.

---

[2] It is important to remember, too, that counsel had no way of anticipating the content of Smith's trial testimony, because she testified to much more than the agent reported before trial. Counsel executed his impeachment strategy on the fly, and he did a thorough and professional job of it.

14

## D. *Giglio* Evidence as to Smith's Credibility

Romero contends that counsel should have filed a motion to compel the

United States to produce statements made by Smith to the agents investigating the

State of Montana's case against Romero's girlfriend, Crystal Lundberg. The

prosecutor in the State's case was Ed Zink. Mr. Zink was also the prosecutor in

the federal case. Under *Giglio v. United States*, 405 U.S. 150, 152-55 (1972), the

prosecution must produce to defense counsel any evidence in its possession that

materially undermines a prosecution witness's credibility.

Lundberg was investigated, tried, convicted, and sentenced for shooting

Smith in the head. The shooting occurred on December 20, 2010. Smith was

interviewed multiple times by state investigators about the shooting. She was

interviewed once by Agent Anuszczyk, on January 18, 2011, about the firearms

theft and the trip to California. She told the jury she was in the Intensive Care Unit

with her skull in a freezer and had come out of her coma only a few days before

she made the statement to the agent. She also said that doctors and nurses "often

came in the room and had to stop" interviews by other law enforcement officers

because she "was throwing things" and "couldn't talk at the time" and "had to use

a board. . . . to write" what she wanted to say. *See* 3 Trial Tr. at 224:21-225:12,

291:20-293:6. And she said she had had more time since her interview with the

federal agent to recall the events of August 2010 from her own memory. *Id.* at

15

293:7-16.

Against this background, Romero avers that Smith "stated many outrageous and unbelievable things concerning the trip to California to 'dispose' of the 'gun's.' Including that there was a caravan of vehicles, including stolen Best-Buy semi-trailers." Mot. § 2255 at 8 [sic]; *see also* Romero Aff. (Doc. 229-2) at 2 ¶ 6; McChesney Aff. (Doc. 229-4) at 2 ¶ 7; 3 Trial Tr. at 240:6-18. He states that he knew of these statements because his sister, Tana, obtained them from discovery provided to Crystal Lundberg in the shooting case. Mot. § 2255 at 8. But, Romero says, although counsel knew of these statements, he made no attempt to obtain them from the prosecutor. *Id.* at 8-9.

At trial, a detective testified that Tana acquired the statements sometime before February 18, 2011. 3 Trial Tr. at 393:3-395:15. It is not unreasonable for an attorney to make no attempt to obtain statements that are "outrageous and unbelievable" when there is an obvious and sympathetic explanation for their outrageousness and unbelievability. Nor is there any reasonable probability that Romero would have been acquitted if counsel had let the jury know that, in the weeks following the gunshot wound to her head, Smith made outrageous and unbelievable statements, including one to the effect that stolen semi-trailers from Best Buy accompanied Smith, Romero, and McChesney out of Billings.

Neither prong of the *Strickland* test is met. This claim is denied.

## E. Jury Instructions

Romero asserts that counsel should have objected to three jury instructions. The three instructions are the elements instructions for Counts 2, 3, and 4. Each states that the United States must prove, beyond reasonable doubt, that each defendant stole or possessed "any one of the firearms listed in Government's Exhibit 1." Jury Instrs. 6, 7, 8 (Doc. 121 at 8-10). Romero claims the instruction compelled the jury to find him guilty of possessing all 136 of the stolen firearms and that, as a result, he was held accountable for all 136 at sentencing. Mot. § 2255 at 10.

This claim is based on a misunderstanding of the relevant law. The jury was indeed required to find, and by its verdict only found, that Romero possessed at least one stolen firearm. Verdict (Doc. 128) at 1 (finding Romero guilty of "possession of *a* stolen firearm") (emphasis added). At sentencing, the judge found that he possessed all 136. *See* Sentencing Tr. (Doc. 183) at 4:17-7:4.

"Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Likewise, "[f]acts that increase the mandatory minimum sentence are . . . elements and must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, __ U.S. __, 133 S. Ct. 2151, 2138 (2013). In

17

Romero's case, there was no mandatory minimum sentence, and the maximum
sentence was 120 months. The same maximum sentence applied regardless of
whether Judge Nielsen found Romero possessed one stolen firearm or 136 stolen
firearms. Therefore, although the jury only found Romero possessed at least one
stolen firearm, the sentencing court was authorized to find as a fact that he
possessed 136 stolen firearms.

Neither prong of the *Strickland* test is met. This claim is denied.

## F. Prejudicial Statements by Smith

Romero asserts that counsel elicited damaging testimony from Smith. He
refers to questions designed to show that Smith was motivated to testify against
Romero's interests because he "broke [her] heart."

When counsel began his cross-examination, the jury already knew that
Smith had been shot in the head a few months after the trip to California. *See* 1
Trial Tr. at 52:22-53:18, 3 Trial Tr. at 201:5-20, 222:9-11, 225:13-24, 229:16-
230:15. But the jury did not know Romero's girlfriend was responsible. The
situation was very delicate. It was impossible to avoid the fact of the shooting.
There was a danger the jury would form a mistaken impression that Romero and/or
McChesney did it. Yet the fact that the love triangle among Smith, Lundberg, and
Romero resulted in the shooting gave Smith a tremendous incentive to paint
Romero as a bad man.

18

Counsel began his cross-examination by showing that Romero had an intimate relationship with Smith and came to her assistance when she needed help to get away from her abusive husband. *See* 3 Trial Tr. at 250:1-253:18. He moved through the events of the trip from Billings to California. Then he showed that Smith's expectations of her relationship with Romero fell apart in Los Angeles. Romero returned to Montana without Smith and acquired a new girlfriend:

| Counsel: | After you saw your brother, you and L.J. began having discussions about renting an apartment; true? |
|---|---|
| Smith: | Yes. |
| Counsel: | And at that point, L.J. was starting to tell you that he was going back to Montana? |
| Smith: | Yes, sir. |
| Counsel: | And that kind of came as a surprise to you? |
| Smith: | Yes, sir. |
| Counsel: | Hurt your feelings a whole lot? |
| Smith: | Uh-huh. |
| Counsel: | Let's be fair, it broke your heart; didn't it? |
| Smith: | Yeah. It did. |
| Counsel: | You were counting on this guy to save you from a husband that was amazingly abusive to you; true? |
| Smith: | Yes, sir. |
| Counsel: | And now he was leaving you again; true? |

19

Smith:       Yes, sir.

Counsel:     Is it fair to say that you were very angry when he was leaving?

Smith:       I wouldn't say angry. Just upset.

. . .

Counsel:     But you don't see him for the next four months; true?

Smith:       Yeah.

Counsel:     You do find out that L.J. has a girlfriend, though; don't you?

Smith:       Yeah.

Counsel:     And she's not a very nice person, isn't that a fair way to say it?

Smith:       If that's how you want to put it, yeah.

Counsel:     She shot you; didn't she?

Smith:       Yes, sir, she did.

Counsel:     She sent you some text messages; didn't she?

Smith:       Yes.

Counsel:     She was pretty possessive of L.J.; right?

Smith:       Yeah.

Counsel:     She didn't want you coming around at all?

Smith:       Nope.

. . .

| | |
|---|---|
| Counsel: | She told you to stay away from him; didn't she? |
| Smith: | Yeah. |
| Counsel: | So in mid-December, Crystal hurt you very badly? |
| Smith: | Yeah. |
| Counsel: | And it's fair to say that you were in a hospital for a long time? |
| Smith: | Yes, I was. |
| Counsel: | And when you were a little better in January is when you met Carl [Agent Anuszczyk]; right? |
| Smith: | Yes, sir. |

3 Trial Tr. at 276:13-278:20.

At this point, counsel showed the jury that Smith's trial testimony added several important facts to what she had told the agent. *Id.* at 279:22-289:25. He concluded:

| | |
|---|---|
| Counsel: | It's fairly tough to sit there right now and look across the courtroom at L.J isn't it? |
| Smith: | (Nods head affirmatively.)<br>Yeah. |
| Counsel: | He treated you really well for a while, and then he treated you really, really badly; didn't he? |
| Smith: | Yeah. |
| Counsel: | He abandoned you in Los Angeles? |

21

| Smith:    | Yes, he did.                                                                                                                              |
|-----------|-------------------------------------------------------------------------------------------------------------------------------------------|
| Counsel:  | You were counting on him?                                                                                                                  |
| Smith:    | Then *he had his girlfriend shoot me in the head*, so yeah, it's pretty tough.                                                             |
| Counsel:  | When you talked to Mr. Anuszczyk in January of 2011, it's fair to sat you were really angry at L.J. then, too; weren't you?                |
| Smith:    | Again, I don't want to say angry, because I'm not angry with him. I'm just hurt. I don't understand why.                                   |

*Id.* at 290:2-24 (emphasis added).

Romero objects to the italicized language. He states both that counsel elicited the statement and that counsel should have immediately moved to strike the statement and have the jury instructed to disregard it. Mot. § 2255 at 11.

Counsel's question was a reasonable one. It solicited a yes or no answer. Smith did not answer the question that was asked but let fly with something entirely different. Then, replying to the very next question, Smith said she was not angry. A reasonable juror could have found that Smith, contrary to her own representation, was in fact quite angry. A reasonable juror could also have thought that Smith was attempting to minimize her anger to enhance her credibility. In addition, counsel had also shown the jury that Crystal was a very jealous woman capable of shooting someone without any encouragement from Romero. In sum, counsel made a cool-headed and reasonable strategic decision to let Smith's

22

unsupported outburst go rather than inviting further remark by objecting and demanding an instruction. His performance was not unreasonable.

Moreover, as noted in connection with the severance claim, the jury's verdict shows that it retained its ability to consider the evidence impartially, despite Smith's accusation. Smith's testimony suggested that Romero participated in the robbery, because he called her in the middle of the night it occurred and said he now had the money to go to California. But the jury acquitted him on Counts 2 and 3. Its decision to convict him on Count 4 was supported not just by Smith's testimony but by Barton's, Reichenberg's, and Agent Anuszczyk's corroboration of it. There is no reasonable probability that Romero would have been acquitted on Count 4 if only Smith had not burst out with her accusation against Romero or if only counsel moved to strike her response and admonish the jury.

Neither prong of the *Strickland* test is met. This claim is denied.

## G. Prejudicial Statements by Counsel

Romero also objects that counsel referred to him as a drug addict and told the jury he had "previous convictions." Counsel reasonably wanted the jury to know that Smith had credibility issues. 1 Trial Tr. at 73:2-22. If he was going to ask her to admit she was an addict, it was reasonable to anticipate his client's own addiction would come out as well. It did. 3 Trial Tr. at 276:5-12. Counsel did not say that Romero had "previous convictions." 1 Trial Tr. at 73:19-74:3.

23

There was nothing unreasonable about counsel's statements. Nor is there a reasonable probability Romero would have been acquitted on Count 4 if only his drug addiction had not been mentioned. This claim is denied.

## H. *Brady* Claim as to McChesney's Statement

Finally, Romero avers that discovery provided in a criminal case to Thomas Van Haele, who was celled next door to McChesney, included a reported statement by one T.A., who said that "McChesney claimed to have guns from the Conway Trucking firearms theft still hidden somewhere in Billings." *See* DEA Report of Investigation (Doc. 229-3 at 25) (filed under seal); *see also* McChesney Aff. at 3 ¶¶ 11-13. Romero contends that T.A.'s statement should have been given to counsel so he could investigate whether the number of firearms attributed to Romero at sentencing could be reduced. Mot. § 2255 at 14-15.

A prosecutor must produce to defense counsel information that is (1) in the prosecution's possession or control; (2) favorable to the defendant; and (3) material to guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A statement is "material" "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the

24

constitutional sense." *United States v. Croft*, 124 F.3d 1109, 1124 (9th Cir. 1997) (citing *Bagley*, 473 U.S. at 682, and quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). Failure to disclose the information must undermine confidence in the outcome of the proceeding. *Bagley*, 473 U.S. at 678.

McChesney and Romero were charged with committing the theft together. Before trial, a statement that McChesney had any stolen gun or guns in his possession was not favorable to either McChesney or Romero.

At sentencing, Romero received an eight-level upward adjustment for possession of all 136 stolen firearms. Presentence Report ¶ 32; U.S.S.G. § 2K2.1(b)(1)(D). Counsel argued that Romero should be held accountable only for one. Sentencing Mem. (Doc. 158) at 4-5. The sentencing judge accepted counsel's argument that the clear and convincing standard should apply but rejected his argument that the standard was met as to only one firearm. The judge said there was "no contest" as to the number of firearms stolen and held Romero accountable for all 136. Sentencing Tr. at 6:3-8.

Romero's possession and McChesney's possession were not mutually exclusive. "More than one person can be in possession of something if each knows of its presence and has the power and intention to control it." Jury Instr. No. 10 (Doc. 121 at 12). Thus, to obtain a benefit at sentencing from T.A.'s statement, Romero would have had to point to some reason to suspect not only that he and

McChesney did not jointly possess all the stolen firearms but also that Romero had possession of fewer than 100. *See* U.S.S.G. § 2K2.1(b)(1)(A)-(C). T.A.'s statement did not speak to joint possession, and, because the statement did not mention a number, the prospect that Romero had possession of fewer than 100 of the stolen firearms was as speculative with T.A.'s statement as without it.

Assuming that T.A. knew more than the DEA agent reported, interviewing him might have led to evidence that Romero was responsible for fewer than 100 firearms. But the assumption is speculation, and information that "might have provided investigatory leads" to the defense is not material under *Brady*. *Downs v. Hoyt*, 232 F.3d 1031, 1037 (9th Cir. 2000). T.A.'s statement was not material and not particularly exculpatory. This claim is denied.

## IV. Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), Rules Governing § 2255 Proceedings. A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484

(2000)).

Romero was entitled to a fair trial, not a perfect one. Counsel faced a delicate task in cross-examining the principal witness against Romero, Lindsey Smith. Smith was shot in the head by Romero's jealous girlfriend with Romero present in the girlfriend's vehicle at the time of the shooting. Smith was still recovering from her wound at the time of trial. Even so, counsel clearly and thoroughly demonstrated for the jury the differences between Smith's statements to an ATF agent before trial and the testimony she gave at trial. He also showed both that Smith had a motive to testify against Romero and that Romero's girlfriend's motive to shoot Smith had nothing to do with the charges the jury had to decide. While the jury found Smith credible, that does not mean counsel was ineffective. In fact, the jury's acquittal of Romero on Counts 2 and 3 show that it paid careful attention to what the witnesses did and did not say, as opposed to acting out of anger or moral opprobrium.

Romero's claim for severance had no support in the law or the facts of the defense. While counsel did not have an expert witness ready to testify about how firearms are packaged for transport or sale, Smith did not say before trial what she said at trial, and the most potent evidence against Romero was not Smith's description of the packaging. There was no evident utility in establishing at trial what the case agent said at grand jury about Count 1, because that count was

27

dismissed before trial. Although Romero claims Smith said "outrageous and unbelievable things" before trial, she was recovering from a serious head wound and testified to the trial jury that she could, after recovering to a significant extent, recall events that transpired three months before she was shot. There was no error in the jury instructions on the elements. While Smith did indeed make a prejudicial remark on cross-examination, counsel did not solicit the remark. Counsel's calm decision to capitalize on Smith's anger, rather than moving to strike the remark and admonish the jury not to consider it, was at least as effective as inviting further remarks. Counsel reasonably forewarned the jury that Romero and Smith were both addicted to drugs, and he did not tell the jury that Romero had prior convictions. Finally, because there is no reasonable probability it would have made a difference at either trial or sentencing, the United States had no obligation to produce to defense counsel a statement by one T.A. that McChesney claimed to have hidden firearms from the Conway theft in Billings.

None of Romero's *Strickland* claims support an inference of either deficient performance or of prejudice. His *Brady* claim regarding T.A.'s statement does not meet the materiality standard. Reasonable jurists would not find a reason to encourage further proceedings. A COA will be denied.

## V. Motion to Unseal Hearing and Obtain Transcript

Finally, Romero moves to unseal the hearing held on Merchant's motion to

withdraw from representing him and requests that a copy be provided to him at public expense. Mot. (Doc. 229-1) at 1. Because the Court consulted the court reporter's rough transcript of the hearing in reviewing Romero's claims for relief, Romero is entitled to have it filed in the record of the case and to receive a copy at public expense. *See* 28 U.S.C. § 753(f).

Accordingly, IT IS HEREBY ORDERED as follows:

1. Romero's motion to unseal the transcript of the hearing held on June 27, 2013 (Doc. 229-1), is GRANTED. The transcript is UNSEALED and shall be filed in the public record, subject only to the standard transcript restrictions.

2. The Court CERTIFIES that the transcript of the hearing held on June 27, 2013, is required to decide one or more issues relevant to Romero's § 2255 motion.

3. The United States shall immediately order the transcript of the hearing for the Court's file and one copy, to be delivered to Lloyd John Romero # 07884-046, FCI Florence, Federal Correctional Institution, P.O. Box 6000, Florence, CO 81226.

4. Romero's motion to vacate, set aside, or correct the sentence under 28 U.S.C. § 2255 (Doc. 229) is DENIED;

5. A certificate of appealability is DENIED. The Clerk of Court shall immediately process the appeal if Romero files a Notice of Appeal;

6. The Clerk of Court shall ensure that all pending motions in this case and in CV 15-121-BLG-SPW are terminated and shall close the civil file by entering judgment in favor of the United States and against Romero.

DATED this ___5th___ day of February, 2016.

Susan P. Watters
United States District Court